51 F.3d 1336
 HURST-ROSCHE ENGINEERS, INCORPORATED, Plaintiff-Appellant,
v.
COMMERCIAL UNION INSURANCE COMPANY, also known as American
Employers Insurance Company and Cincinnati
Insurance Company, Defendants-Appellees.
 No. 94-1605.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 20, 1994.
Decided April 5, 1995.
 
 Richard J. Pautler, Catherine H. Johnson (argued), Catherine H. Johnson, Peper, Martin, Jensen, Maichel & Hetlage, St. Louis, MO, for Hurst-Rosche Engineers, Inc.
 Al J. Pranaitis, C. Raymond Bell (argued), Hoagland, Fitzgerald, Smith & Pranaitis, Alton, IL, for Commercial Union Ins. Co.
 Paul W. Johnson (argued), Burroughs, Hepler, Broom, Macdonald & Hebrank, Edwardsville, IL, for Cincinnati Ins. Co.
 Before CUMMINGS, FERGUSON* and COFFEY, Circuit Judges.
 COFFEY, Circuit Judge.
 
 
 1
 Hurst-Rosche Engineers, Inc. ("Hurst-Rosche"), appeals the district court's orders granting summary judgment in favor of its two insurers, Commercial Union Insurance Company, also known as American Employers Insurance Company ("American") and Cincinnati Insurance Company ("Cincinnati"). The district court held that the professional liability exclusion clauses contained in each of two commercial liability policies issued to Hurst-Rosche by American and Cincinnati relieved the insurers of any duty to defend or indemnify Hurst-Rosche against libel and tortious interference with contract claims arising from an alleged defamatory letter written by K. Dean McIlravy, Hurst-Rosche's general manager. The court also held that the Cincinnati policy's definition of a covered "occurrence" precluded coverage for intentional tort claims, including tortious interference with contract. We affirm the trial court's order granting summary judgment in favor of American and also affirm the district court's order granting summary judgment in favor of Cincinnati, but on grounds different from those relied upon in the trial court's decision.
 
 I. FACTUAL BACKGROUND
 
 2
 Hurst-Rosche, an engineering firm based in Hillsboro, Illinois, was hired to design and supervise the construction of a twenty-two building apartment complex for the Housing Authority of St. Clair County, Illinois. The Housing Authority retained Quality Granite Construction Co. ("Quality Granite") of Madison County, Illinois, as the general contractor for the project. Hurst-Rosche's contract with the Housing Authority required that weekly inspection reports be filed with the Housing Authority specifying "whether or not the work is compliant with job plans and specifications." Hurst-Rosche was required to report "any deficiencies observed" and advise the Housing Authority as to "the approximate completion status" of the project as of the date of each inspection.
 
 
 3
 On September 12, 1989, Hurst-Rosche's general manager, K. Dean McIlravy, sent a letter typed on company stationery to Transamerica Premier Insurance Company, the issuer of the performance bond which guaranteed Quality Granite's work. The letter read:
 
 Transamerica Premier Insurance Company
 333 Anita Drive
 Orange, California 92668
 Attention: Mr. David Marcoulides
 Re: 1984 CIAP Project IL 30-907
 Exterior Improvements
 Brickwork, Siding and Canopies
 St. Clair County Housing Authority
 Village of Brooklyn, Illinois
 Dear Sir:
 
 4
 In view of our recent meetings with the St. Clair County Housing Authority (HUD), and Mr. Vincent Marsala [the president] of "Quality" Granite Construction Company, we feel it is our responsibility to advise you that "Quality" Granite may be considered in default.
 
 
 5
 Our reasoning being the contractor's failure to complete the project in a timely manner, substandard workmanship, reluctance to complete punch list items and inability to correctly interpret the contract documents, plans and specifications as bid.
 
 
 6
 Due to these circumstances, it would be our recommendation that a meeting be scheduled as soon as possible with all parties involved in order to resolve the differences and close out the project.
 
 
 7
 Please advise this office to schedule a meeting. Should you have any questions, feel free to contact me at 618/398-0930.
 
 
 8
 Very truly yours,
 
 
 9
 HURST-ROSCHE ENGINEERS, INC.
 
 K. Dean McIlravy
 KDM/ss
 
 10
 cc: Mr. David L. Wagner--S.C.C.H.A.
 
 Mr. Vincent Marsala--Quality Granite
 
 11
 Construction Co.
 
 
 12
 (Emphasis in original.)
 
 
 13
 After reading this letter, Quality Granite's president, Vincent Marsala, filed suit against Hurst-Rosche and K. Dean McIlravy in Madison County, Illinois for libel and tortious interference with contract (the "Quality Granite lawsuit").[1] In its complaint, filed January 18, 1990, Quality Granite alleged as follows:
 
 
 14
 [Count I--Defamation]
 
 
 15
 * * * * * *
 
 
 16
 3. At all times herein mentioned, K. Dean McIlravey [sic] was, and still is, an agent and/or servant of Hurst-Rosche, acting in furtherance of the business interests of Hurst-Rosche.
 
 
 17
 4. By letter dated September 12, 1989, a copy of which is attached hereto as Exhibit A and incorporated herein by reference, Hurst-Rosche, acting through McIlravey [sic], published certain statements relating to [Quality Granite's] business and occupation.
 
 
 18
 5. Such statements were published to various third parties, including, without limitation, Transamerica Premier Insurance Company and the St. Clair County Housing Authority.
 
 
 19
 6. Such letter contains false and defamatory statements of fact imputing lack of ability on the part of [Quality Granite] in its trade or business, including a statement accusing [Quality Granite] of "failure to complete the project in a timely manner, sub-standard workmanship, reluctance to complete punch list items and inability to correctly interpret the contract documents, plans and specifications as bid."
 
 
 20
 7. As a proximate result of the foregoing false and defamatory statements, [Quality Granite] has lost profits and its reputation has been seriously damaged.
 
 
 21
 * * * * * *
 
 
 22
 [Count V--Tortious Interference with Contract]
 
 
 23
 * * * * * *
 
 
 24
 7. At the time the aforesaid statements were published to St. Clair County Housing Authority ("SCCHA"), a contract existed between [Quality Granite] and SCCHA, pursuant to which contract [Quality Granite] was owed in excess of $30,000.00.
 
 
 25
 8. At the time the aforesaid statements were published to Transamerica Premier Insurance Company ("Transamerica"), an on-going business relationship existed between [Quality Granite] and Transamerica, pursuant to which Transamerica underwrote bonds for construction projects for [Quality Granite].
 
 
 26
 9. At the time the aforesaid statements were published to Transamerica and SCCHA, McIlravey [sic] knew of the existence of the foregoing contractual and business relationships between [Quality Granite] and Transamerica and [Quality Granite] and SCCHA.
 
 
 27
 10. By virtue of such false and defamatory statements, Hurst-Rosche tortiously interfered with the existing contractual and business relationships between [Quality Granite] and SCCHA and [Quality Granite] and Transamerica, in that, as a result of such statements, (a) SCCHA has withheld the sums due [Quality Granite] pursuant to its contract and (b) Transamerica has refused to underwrite bonds on subsequent projects.
 
 
 28
 * * * * * *
 
 
 29
 12. The aforesaid tortious interference with [Quality Granite's] contractual and business relations were committed by McIlravy knowingly and with intent to injure [Quality Granite].
 
 
 30
 In January 1990, Hurst-Rosche was the policyholder on two commercial liability insurance policies issued by American and Cincinnati. Both the American policy, a general commercial liability policy, and the Cincinnati policy, an umbrella commercial liability policy, expressly covered defamation claims. The American policy provided coverage for personal injuries, defined by the policy to include injuries "arising out of [the] ... [o]ral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; ...." The Cincinnati policy also provided coverage for personal injuries, defined by the policy to include "libel, slander, [and] defamation of character,...." In February 1990, Hurst-Rosche tendered the defense of the Quality Granite lawsuit to both American and Cincinnati. The insurers, American and Cincinnati, reviewed the language of their respective policies and compared Quality Granite's claims to the policies' terms of coverage and exclusions.
 
 
 31
 American denied coverage and refused to defend Hurst-Rosche in the Quality Granite lawsuit because of the professional liability exclusion clause contained in the American policy, which stated:
 
 
 32
 This insurance does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" arising out of the rendering or failure to render any professional services by or for you, including:
 
 
 33
 1. The preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; and
 
 
 34
 2. Supervisory, inspection or engineering services.
 
 
 35
 By letter dated March 12, 1990, American notified Hurst-Rosche that the Quality Granite complaint "alleges defamation of the plaintiffs, publication of defamatory statements concerning the plaintiffs, [and the] plaintiffs are requesting punitive damages...." American quoted the language of the professional liability exclusion clause as the reason for its denial of coverage and urged Hurst-Rosche to retain its own attorney to defend the Quality Granite lawsuit.
 
 
 36
 Cincinnati also denied coverage and refused to defend Hurst-Rosche in the Quality Granite lawsuit. Cincinnati based its denial of coverage on two policy provisions, one which restricted coverage to "occurrences," defined as "an accident, or a happening or event ... which unexpectedly or unintentionally results in personal injury, ..." (emphasis added) (as noted above, the policy defined personal injury to include libel) and one which excluded from coverage personal injuries or damages
 
 
 37
 aris[ing] out of any claim for Professional Liability or Malpractice made against an insured caused by any negligent act, error, or omission of an insured or any other person for whose acts an insured is legally liable in the conduct of any business, trade [or] profession....
 
 
 38
 On April 5, 1990, Cincinnati informed Hurst-Rosche in writing that it would not provide a defense to the Quality Granite lawsuit "since that is the responsibility of your primary carrier." Cincinnati further advised Hurst-Rosche that "[a]ll of, or parts of the allegations contained in the [Quality Granite complaint] ... may fall within the exclusionary language [of the Cincinnati policy]." A third provision the Cincinnati policy, entitled the Contractor's Limitation Endorsement, which Cincinnati did not specifically reference in its letter to Hurst-Rosche, excluded coverage for
 
 
 39
 Personal Injury or Property Damage arising out of any error, omission, or mistake of a professional nature performed by or on behalf of the Insured, including the preparation or approval of maps, plans, opinions, reports, surveys, designs or specifications, and any supervisory, inspection, or engineering services.
 
 
 40
 Cincinnati expressly reserved its right to deny coverage for Quality Granite's claims.
 
 
 41
 In January 1991, Hurst-Rosche once again tendered the defense of the Quality Granite lawsuit to American and Cincinnati. Both insurers again refused Hurst-Rosche's request based on the same policy exclusions on which they relied in refusing Hurst-Rosche's initial request for a defense. The jury trial in the Quality Granite lawsuit commenced in October 1991. On October 25, 1991, the jury returned a verdict in favor of Quality Granite and awarded $430,000 in compensatory damages and $100,000 in punitive damages. The Illinois appellate court affirmed the judgment. Quality Granite Construction Co. v. Hurst-Rosche Engineers, Inc., 261 Ill.App.3d 21, 198 Ill.Dec. 528, 632 N.E.2d 1139 (1994). Hurst-Rosche incurred over $60,000 in attorneys' fees and costs in defending this lawsuit.
 
 
 42
 On March 9, 1992, Hurst-Rosche filed this action in federal district court against American and Cincinnati seeking damages, recovery of attorneys' fees and declaratory relief for breach of contract and vexatious refusal to pay insurance benefits. On cross-motions for summary judgment, the district court found in favor of the insurers. The district court held that the professional liability exclusion clauses contained in the American and Cincinnati policies relieved the insurers of any duty to defend or indemnify Hurst-Rosche against the libel and tortious interference with contract claims alleged in the Quality Granite complaint. The court also held that the Cincinnati policy's definition of a covered "occurrence"--which limited coverage to unintentional acts or events--precluded coverage for intentional tort claims, including Quality Granite's claim for tortious interference with contract. Hurst-Rosche appeals. Three issues are raised on appeal: (1) whether the professional liability exclusion clauses contained in each of the two commercial liability policies issued by American and Cincinnati to Hurst-Rosche precluded coverage for libel and tortious interference with contract claims arising from the September 12, 1989 letter written by Hurst-Rosche's manager, K. Dean McIlravy; (2) whether the Contractor's Limitation Endorsement contained in the Cincinnati policy precluded coverage for Quality Granite's claims for intentional torts; and (3) whether the definition of a covered "occurrence" in the Cincinnati policy precluded coverage for Quality Granite's claims for intentional torts.
 
 II. DISCUSSION
 
 43
 We review the district court's grant of summary judgment de novo, drawing all reasonable inferences from the record in the light most favorable to the non-moving party. Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co., 976 F.2d 1037, 1039 (7th Cir.1992); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). Summary judgment is proper only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). We must also determine whether the district court properly applied the relevant state substantive law. Colip v. Clare, 26 F.3d 712, 714 (7th Cir.1994). Under Illinois law, "[t]he construction of an insurance policy and a determination of the rights and obligations thereunder are questions of law for the court which are appropriate subjects for disposition by way of summary judgment." Crum & Forster v. Resolution Trust Corp., 156 Ill.2d 384, 189 Ill.Dec. 756, 760, 620 N.E.2d 1073, 1077 (1993).
 
 
 44
 The legal principles governing the construction of insurance policies are well settled. An insurer's duty to defend is more inclusive than its duty to indemnify. Tews Funeral Home, Inc. v. Ohio Cas. Ins. Co., 832 F.2d 1037, 1042 (7th Cir.1987). "In determining whether an insurer has a duty to defend its insured, the court must look to the allegations in the underlying complaint and compare these allegations to the relevant coverage provisions of the insurance policy." Crum & Forster, 189 Ill.Dec. at 762, 620 N.E.2d at 1079. When making this comparison, the court should not simply look to the particular legal theories pursued by the claimant, but must focus on the allegedly tortious conduct on which the lawsuit is based. Pipefitters Welfare Educ. Fund, 976 F.2d at 1039 (citing Western Cas. & Sur. Co. v. Adams County, 179 Ill.App.3d 752, 128 Ill.Dec. 621, 623, 534 N.E.2d 1066, 1068 (1989)). "If the complaint states a claim that is within, or even potentially or arguably within, the scope of coverage provided by the policy," the insurer is obligated to provide the insured a defense. Id. (citing United States Fidelity & Guar. Co. v. Wilkin Insulation Co., 144 Ill.2d 64, 161 Ill.Dec. 280, 284, 578 N.E.2d 926, 930 (1991)). An insurer is obligated to defend its insured if the allegations in a complaint give rise to the possibility of recovery under the policy; " '[t]here need not be a probability of recovery.' " Tews Funeral Home, Inc., 832 F.2d at 1042 (quoting 7C J. Appleman, Insurance Law & Practice Sec. 4683.01 at 67 (1979)).
 
 
 45
 The insurer may properly refuse to defend its insured only if it is clear from the face of the complaint that the wrongdoing alleged is not covered under the policy. Pipefitters Welfare Educ. Fund, 976 F.2d at 1040 (citing Conway v. Country Cas. Ins. Co., 92 Ill.2d 388, 65 Ill.Dec. 934, 936, 442 N.E.2d 245, 247 (1982)). If any one claim potentially falls within the scope of coverage, the insurer must provide a defense. Id. (citing Maryland Cas. Co. v. Peppers, 64 Ill.2d 187, 355 N.E.2d 24, 28 (1976)). The court "must read the underlying complaint liberally and in favor of the insured." Travelers Ins. Cos. v. Penda Corp., 974 F.2d 823, 829 (7th Cir.1992) (citing Wilkin Insulation Co., 161 Ill.Dec. at 284, 578 N.E.2d at 930).
 
 
 46
 Where, as here, an insurer denies a duty to defend based on an exclusionary clause within a policy, "its application must be clear and free from doubt." Transamerica Ins. Co. v. South, 975 F.2d 321, 327 (7th Cir.1992) (citing Insurance Co. v. Markogiannakis, 188 Ill.App.3d 643, 136 Ill.Dec. 307, 319, 544 N.E.2d 1082, 1094 (1989)). Any ambiguities within the policy must be construed in favor of the insured. Pipefitters Welfare Educ. Fund, 976 F.2d at 1040 (citing Wilkin Insulation Co., 161 Ill.Dec. at 284, 578 N.E.2d at 930). However, the court must not create an ambiguity where none exists; a clear and unambiguous provision must be applied as written. South, 975 F.2d at 327 (citing Economy Fire & Cas. Co. v. Bassett, 170 Ill.App.3d 765, 121 Ill.Dec. 481, 484, 525 N.E.2d 539, 542 (1988)). The burden of proving that a claim falls within an exclusion rests squarely on the insurer, because "(1) the insured's intent in purchasing an insurance policy is to obtain coverage, therefore any ambiguity jeopardizing such coverage should be construed consistent with the insured's intent, and (2) the insurer is the drafter of the policy and could have drafted the ambiguous provision to be clear and specific." Id. (citing Economy Fire & Cas. Co. v. Kubik, 142 Ill.App.3d 906, 97 Ill.Dec. 68, 71, 492 N.E.2d 504, 507 (1986)).
 
 
 47
 A. The Professional Liability Exclusion Clauses
 
 
 48
 Both the American policy and the Cincinnati policy contained professional liability exclusion clauses, which preclude coverage of claims arising from the rendering or failure to render professional services.[2] Specifically, the professional liability exclusion clause in the American policy stated that
 
 
 49
 This insurance does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" arising out of the rendering or failure to render any professional services by or for you, including:
 
 
 50
 1. The preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; and
 
 
 51
 2. Supervisory, inspection or engineering services.
 
 
 52
 The professional liability exclusion clause in the Cincinnati policy excluded from coverage personal injuries or damages
 
 
 53
 aris[ing] out of any claim for Professional Liability or Malpractice made against an insured caused by any negligent act, error, or omission of an insured or any other person for whose acts an insured is legally liable in the conduct of any business, trade [or] profession....
 
 
 54
 Courts that have construed professional liability exclusion clauses such as these have "adopted an expansive definition of the term 'professional service.' " State Street Bank & Trust v. INA Ins. Co., 207 Ill.App.3d 961, 153 Ill.Dec. 327, 332, 567 N.E.2d 42, 47 (1991).
 
 
 55
 The term is not limited to services performed by persons who must be licensed by a governmental authority in order to practice their professions. Rather, it refers to any business activity conducted by the insured which involves specialized knowledge, labor, or skill, and is predominantly mental or intellectual as opposed to physical or manual in nature.
 
 
 56
 Id.; see also Aetna Cas. & Sur. Co. v. Dannenfeldt, 778 F.Supp. 484, 496 (D.Ariz.1991) (citation and internal quotations omitted) ("[i]n determining whether a particular act is of a professional nature or a 'professional service' we must not look to the title or character of the party performing the act, but to the act itself.... Courts consistently consider the context of the business or profession in which it is performed").
 
 
 57
 We agree with the insurers that Quality Granite's claims against Hurst-Rosche and K. Dean McIlravy, as those claims are set forth in Quality Granite's complaint, arose from McIlravy's rendering of his professional opinion with respect to Quality Granite's performance on the St. Clair County Housing Authority construction project. McIlravy was employed by Hurst-Rosche as general manager at the time he wrote the letter to Transamerica Premier Insurance Company, the issuer of Quality Granite's performance bond guaranteeing its work on the project. The letter, written on Hurst-Rosche stationery, referenced several meetings with the Housing Authority and specifically criticized Quality Granite for its "failure to complete the project in a timely manner, substandard workmanship, reluctance to complete punch list items and inability to correctly interpret the contract documents, plans and specifications as bid." Moreover, the letter recommended scheduling a meeting "with all parties involved in order to resolve the differences and close out the project." Each of these facts appeared on the face of Quality Granite's complaint, except for McIlravy's position with Hurst-Rosche, which was a fact the insurers could readily have ascertained from their policyholder. See United States Fidelity & Guar. Co. v. Wilkin Insulation Co., 193 Ill.App.3d 1087, 140 Ill.Dec. 907, 911-12, 550 N.E.2d 1032, 1036-37 (1989) ("the insurer must defend if the insurer has knowledge of true but unpleaded facts which when taken together with the allegations in the complaint indicate that the claim is potentially covered by the policy"). We agree with the trial court that "[t]he tenor of the letter, its heading, and its contents, all indicate that the letter was written as a part of the business activity of Hurst-Rosche."
 
 
 58
 Hurst-Rosche points out that the Quality Granite complaint did not assert that the defamation resulted from Hurst-Rosche's rendition of professional services. Quality Granite's goal in drafting its complaint was to allege facts sufficient to state a claim against Hurst-Rosche. See 735 ILCS 5/2-603 (1994); Gonzalez v. Thorek Hosp. & Med. Center, 186 Ill.App.3d 648, 134 Ill.Dec. 453, 455, 542 N.E.2d 799, 801 (1989), rev'd on other grounds, 143 Ill.2d 28, 155 Ill.Dec. 796, 570 N.E.2d 309 (1991) (quoting B.L. Cartage Co. v. City of Chicago, 35 Ill.App.3d 1055, 1060, 342 N.E.2d 733 (1976)) ("[a]t the very least, '[a complaint] must contain sufficient factual allegations ... to demonstrate to the court and the defendant ... that the plaintiff is or may be harmed, the way in which the plaintiff has been harmed and that the harm results from some legal transgression or violation of a legal duty by the defendant' "). Quality Granite had no particular incentive to state its claims using language that would trigger a duty to defend on the part of Hurst-Rosche's insurers. Who was responsible for Hurst-Rosche's defense was of no concern to Quality Granite; whether a particular claim raised in a complaint is covered by an insurance policy does not depend on the precision with which that claim is stated within the complaint. The complaint "need not allege or use language affirmatively bringing the claims within the scope of the policy, as the question of coverage should not hinge exclusively on the draftsmanship skills or whims of the plaintiff in the underlying action." Western Cas. & Sur. Co., 128 Ill.Dec. at 623, 534 N.E.2d at 1068 (citing International Minerals & Chemical Corp. v. Liberty Mut. Ins. Co., 168 Ill.App.3d 361, 119 Ill.Dec. 96, 106, 522 N.E.2d 758, 768 (1988)). What is determinative is what misconduct is alleged.
 
 
 59
 Quality Granite alleged that McIlravy, a Hurst-Rosche employee, "acting in furtherance of the business interests of Hurst-Rosche," sent a letter publishing a statement that in effect disparaged Quality Granite's business reputation and certainly interfered with and maligned Quality Granite's contractual and business relationships with the Housing Authority and Transamerica Premier Insurance Company, which allegedly suspended Quality Granite's bonding temporarily after receiving McIlravy's letter. The letter attached to Quality Granite's complaint was written on Hurst-Rosche stationery, referred to Quality Granite's performance on a project, and suggested that the parties meet to resolve their differences and close out the project. This letter, combined with the allegations of Quality Granite's complaint, supports the district court's conclusion that Quality Granite's claims arose out of Hurst-Rosche's rendition of professional services. In our opinion, this type of tortious conduct falls squarely within the professional services exclusion, which excluded coverage for claims arising from the "preparing" of "opinions" and "reports."
 
 
 60
 Hurst-Rosche also argues that "an equally possible interpretation of the allegations in the [Quality Granite] complaint is that [Quality Granite] was seeking damages for libel that arose out of conduct having nothing to do with Hurst-Rosche's professional activities." We disagree and have been unable to discover any plausible basis for this interpretation in the record. Although an insurer's duty to defend is triggered by the mere "possibility" of a covered claim, Tews Funeral Home, Inc., 832 F.2d at 1042, what is the "possibility" of a covered claim must be governed by reason. Hurst-Rosche asked its insurers, and the district court, to accept an unreasonable interpretation of the Quality Granite complaint; according to Hurst-Rosche, it was equally possible for the district court to conclude, based on the allegations in the complaint, that McIlravy was a rogue employee who absconded with company stationery to write and deliver a defamatory letter in vindication of some personal grievance he had with Quality Granite. We do not agree that insurers must accept an insured's unreasonable and far-fetched interpretation of a plaintiff's allegations of wrongdoing. The allegations within Quality Granite's complaint clearly imply wrongdoing on the part of a Hurst-Rosche employee within the scope of that employee's rendition of professional services in the preparation of an opinion or report. Thus, Quality Granite's claims fall outside the scope of coverage agreed upon by the parties to these respective insurance contracts.
 
 
 61
 B. The Cincinnati Policy's Contractor's Limitation Endorsement
 
 
 62
 As noted above, the Cincinnati policy's professional liability exclusion clause denies coverage for negligent acts, errors, or omissions only. Because the Quality Granite complaint stated claims for intentional torts, including libel with malice and tortious interference with contract, the Cincinnati policy's professional liability exclusion clause did not preclude coverage for these claims.[3] Nonetheless, the Cincinnati policy's Contractor's Limitation Endorsement broadened the professional services exclusion to encompass intentional conduct as well as negligent acts, errors and omissions.
 
 
 63
 The Cincinnati policy's Contractor's Limitation Endorsement excluded coverage for
 
 
 64
 Personal Injury or Property Damage arising out of any error, omission, or mistake of a professional nature performed by or on behalf of the Insured, including the preparation or approval of maps, plans, opinions, reports, surveys, designs or specifications, and any supervisory, inspection, or engineering services.
 
 
 65
 This exclusion is substantially the same as the professional liability exclusion clause contained in the American policy. Our analysis with respect to the applicability of the American policy's professional liability exclusion clause applies with equal force to this Contractor's Limitation Endorsement. Although the district court did not address whether the Contractor's Limitation Endorsement would preclude coverage for Quality Granite's intentional tort claims, we are of the opinion that it in fact does, and that accordingly, Cincinnati had no duty to defend Hurst-Rosche in the Quality Granite lawsuit.
 
 
 66
 C. The Cincinnati Policy's Exclusion of Coverage for Intentional Torts
 
 
 67
 The district court's order granting summary judgment in favor of Cincinnati relied in part on the definition in the Cincinnati policy of covered events as "occurrences," meaning "an accident, or a happening or event ... which unexpectedly or unintentionally results in personal injury,...." (Emphasis added.) Cincinnati argued, and the district court agreed, that the definition of a covered "occurrence" contained in Cincinnati's policy precluded coverage for Quality Granite's claims for intentional torts, including libel with malice and tortious interference with contract. The district court's interpretation of the Cincinnati policy's coverage and exclusion language was contrary to binding Seventh Circuit precedent, see Tews Funeral Home, Inc. v. Ohio Cas. Ins. Co., 832 F.2d 1037 (7th Cir.1987), therefore we choose not to affirm the judgment on this ground.
 
 
 68
 The Cincinnati policy defined covered personal injury claims to include claims for "libel, slander, defamation of character, false arrest, willful or false detention or imprisonment, wrongful eviction or entry, malicious prosecution, humiliation, [and] invasion of privacy...." Many of these torts, by definition, require proof of intent or willfulness. Despite this apparent coverage for the specified intentional torts, the Cincinnati policy's definition of an "occurrence" limits coverage only to those claims resulting from unintentional conduct. These provisions--the definition of personal injury which includes intentional torts and the definition of "occurrence" which excludes intentional torts--are ambiguous and create an internal inconsistency; on the one hand Cincinnati purports to provide coverage for intentional tort claims, and on the other hand Cincinnati denies coverage for those same claims.
 
 
 69
 In Tews Funeral Home, Inc. v. Ohio Cas. Ins. Co., 832 F.2d 1037 (7th Cir.1987), this court addressed this same issue:
 
 
 70
 Applying the well recognized rules of insurance contract construction and interpretation, ... we think [the insurer's] policy is, at best, ambiguous with respect to its coverages or exclusions. "Advertising offense" is defined to include many torts that characteristically require intent, maliciousness or wilfullness, such as libel, slander, defamation or the various forms of unfair competition. This language is plain and unambiguous and must be given its ordinary meaning. The ambiguity arises, however, when one looks at the definition of "occurrence," which states that only unintentional acts from the standpoint of the insured are covered. In effect, one part of [the insurer's] policy insures against intentional torts or acts, while another part of the policy attempts to exclude coverage for these same acts. We therefore must resolve this ambiguity against [the insurer] and hold that it must defend [its insured]....
 
 
 71
 Id. at 1045. The Cincinnati policy's definitions of covered personal injuries and "occurrences" are similar to those provisions in Tews Funeral Home, Inc. this court found ambiguous and inconsistent. This ambiguity in the Cincinnati policy must be resolved in favor of the insured. See Penda Corp., 974 F.2d at 828 (quoting Wilkin Insulation Co., 161 Ill.Dec. at 284, 578 N.E.2d at 930) (" '[a]ll doubts and ambiguities must be resolved in favor of the insured' "). Thus, the policy's "occurrence" language does not preclude coverage for Quality Granite's claims for libel with malice and tortious interference with contract. We do not agree with the district court's conclusion that the Cincinnati policy's definition of "occurrence" excludes intentional torts.
 
 III. CONCLUSION
 
 72
 It is clear from the face of Quality Granite's complaint, which asserted claims for libel and tortious interference with contract, that the wrongdoing alleged was outside the scope of coverage provided by the American and Cincinnati policies. Accordingly, we hold that neither American nor Cincinnati had the duty to defend Hurst-Rosche in the Quality Granite lawsuit. The district court's orders granting summary judgment in favor of American and Cincinnati are
 
 
 73
 AFFIRMED.
 
 
 
 *
 Hon. Warren J. Ferguson, Judge of the United States Court of Appeals for the Ninth Circuit, is sitting by designation
 
 
 [1]
 Quality Granite's complaint contained five counts. Counts I and III stated claims against Hurst-Rosche and K. Dean McIlravy for libel without malice. Counts II and IV stated claims against Hurst-Rosche and K. Dean McIlravy for libel with malice. Count V stated a claim against both defendants for tortious interference with contract
 
 
 [2]
 The Cincinnati policy's professional liability exclusion clause pertains to only negligent conduct on the part of the insured. The policy's Contractor's Limitation Endorsement applies to Quality Granite's claims for intentional torts, and is discussed in section II.B. of this opinion. The American policy's professional liability exclusion clause does not differentiate between negligent and intentional conduct
 
 
 [3]
 As noted above, the Cincinnati policy provided coverage for personal injuries, defined to include "libel, slander, [and] defamation of character,...."